IN THE COURT OF APPEALS OF NORTH CAROLINA

2023-NCCOA-5

No. COA21-794

Filed 17 January 2023

Catawba County, Nos. 19 CRS 2630–31

STATE OF NORTH CAROLINA

v.

JOSHUA JEZRELL DUNCAN

Appeal by the State from order entered 22 June 2021 by Judge Donnie Hoover in Catawba County Superior Court. Heard in the Court of Appeals 20 September 2022.

*Attorney General Joshua H. Stein, by Assistant Attorney General Nicholas R. Sanders, for the State.*

*The Law Offices of J. Edgar Halstead, III, PLLC, by J. Edgar Halstead, III, for defendant-appellee.*

ZACHARY, Judge.

The State appeals from the trial court's order granting Defendant Joshua Jezrell Duncan's motion to suppress. After careful review, we reverse and remand to the trial court for further proceedings.

## I.    Background

On 31 August 2018, Sergeant Derek Slaughter and another Newton Police Department officer were surveilling a residence and the adjacent parking lot in

Newton. The officers had received information that "drug activity" was occurring at that location, and that a "black male with dreadlock-type hair" who had numerous outstanding indictments for trafficking marijuana was "at the residence on a frequent basis."

¶ 3 As the officers watched from an unmarked vehicle, they saw a Cadillac pull into the driveway, drop off a passenger, and depart. While the officers could not positively identify the driver, they observed that he was "a black male with similar hairstyle of the subject in question[.]" They also noted the Cadillac's license plate number, which they pulled up in the CJLEADS database.[1] From CJLEADS, the officers determined that the driver's license of the vehicle's registered owner was "medically canceled," and they called for a marked unit to conduct a traffic stop of the Cadillac.

¶ 4 Patrol Sergeant Brian Bixby of the Newton Police Department responded to the call and conducted the traffic stop of the Cadillac. Officer Bixby approached the vehicle and asked Defendant, the driver, for his driver's license and registration. Through CJLEADS, Officer Bixby confirmed Sergeant Slaughter's report that Defendant's driver's license was medically canceled.

---

[1] CJLEADS is "a database which details a person's history of contacts with law enforcement in the form of a list of criminal charges filed against the individual[.]" *State v. Johnson*, 378 N.C. 236, 2021-NCSC-85, ¶ 4.

¶ 5        Later, at the hearing on Defendant's motion to suppress, Officer Bixby testified that the officers had discussed the implications of a medically canceled license. Officer Bixby testified that initially, he "was confused[,]" because "medically canceled" "means no operator's license or suspended." Then, however, Officer Bixby "looked at the details of the cancellation, [and] saw it was suspended, which would have corroborated . . . Sergeant Slaughter's statement that it was revoked."

¶ 6        As Officer Bixby spoke with Sergeant Slaughter over the radio, he checked Defendant's criminal record, which included past convictions for violent crimes that "raised [Officer Bixby's] alert level." He called for backup because he had "decided to arrest [Defendant] for driving while license revoked." Once additional officers arrived, Officer Bixby arrested Defendant. During the search of Defendant incident to his arrest, Officer Bixby discovered baggies of a substance that he believed to be crystal methamphetamine hidden in Defendant's hair. Later, while Defendant was being processed at the police station, Officer Bixby discovered a ball of "wadded up aluminum foil" on the ground at Defendant's feet. Defendant explained that it had fallen out of his hair and admitted that it contained more methamphetamine.

¶ 7        On 24 June 2019, a Catawba County grand jury returned indictments charging Defendant with (1) possession with intent to manufacture, sell, or deliver methamphetamine, (2) maintaining a vehicle for keeping and selling methamphetamine or any mixture containing methamphetamine, and (3) attaining

the status of habitual felon. On 27 October 2020, the State filed notice of its intent to introduce evidence at trial that law enforcement officers obtained by virtue of a search without a search warrant. On 18 June 2021, Defendant filed a motion to suppress.

On 22 June 2021, Defendant's motion to suppress came on for hearing in Catawba County Superior Court. After considering the testimony of Sergeant Slaughter and Officer Bixby, together with the arguments of counsel, the trial court granted Defendant's motion to suppress. In its order entered the same day, the trial court made the following relevant findings and conclusions:

> THE ORIGINAL TIP TO OFFICER[S] TO BE ON THE LOOK OUT FOR A BLACK/MALE WITH DREADS WAS INSUFFICIENT TO CONSTITUTE REASONABLE SUSPICION TO PURSUE DEFENDANT FURTHER, INCLUDING THE DISCOVERY OF THE ISSUES WITH DEFENDANT'S DRIVER'S LICEN[S]E; THEREAFTER, THE DRIVING OFFENSE WAS TO BE TREATED AS A NO OPERATOR'S LICENSE PURSUANT TO N.C.G.S. 20-29.1 AND THEREFORE DID NOT CONSTITUTE PROBABLE CAUSE FOR ARREST.

The State gave oral notice of appeal at the conclusion of hearing and also timely filed written notice of appeal.

## II.   Discussion

On appeal, the State argues that the trial court erred by granting Defendant's motion to suppress based on its erroneous conclusions that law enforcement officers lacked (1) reasonable suspicion to stop the Cadillac, and (2) probable cause to arrest

Defendant.

## A. Standard of Review

Our appellate courts review a trial court's order granting "a defendant's suppression motion by determining whether the trial court's underlying findings of fact are supported by competent evidence and whether those factual findings in turn support the trial court's ultimate conclusions of law." *State v. Parisi*, 372 N.C. 639, 649, 831 S.E.2d 236, 243 (2019) (citation and internal quotation marks omitted). Under this standard of review, "the trial court's findings of fact are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting." *Id.* (citation and internal quotation marks omitted). However, the trial court's "conclusions of law are reviewed de novo and are subject to full review, with an appellate court being allowed to consider the matter anew and freely substitute its own judgment for that of the lower tribunal." *Id.* (citations and internal quotation marks omitted).

## B. Analysis

The State contends that the trial court erred by determining that Officer Bixby lacked both reasonable suspicion to stop the Cadillac and probable cause to arrest Defendant, and therefore, by granting Defendant's motion to suppress the evidence seized during the search incident to Defendant's arrest. For the reasons that follow, we conclude that the trial court erred in reaching both conclusions, and in granting

Defendant's motion to suppress. Accordingly, we reverse and remand for further proceedings.

### 1. *Reasonable Suspicion to Stop Defendant*

¶ 13        The trial court found that Officer Bixby did not have "REASONABLE SUSPICION TO PURSUE DEFENDANT FURTHER, INCLUDING THE DISCOVERY OF THE ISSUES WITH DEFENDANT'S DRIVER'S LICEN[S]E[.]" However, as explained below, a law enforcement officer does not need reasonable suspicion to investigate a plainly visible license plate number, because a license plate check does not implicate a defendant's Fourth Amendment rights. And as the State correctly contends, "[t]he 'original tip' referenced by the trial court is irrelevant because Officer Bixby had reasonable suspicion at the time of the seizure based on the traffic violation."

¶ 14        "Both the Fourth Amendment to the Constitution of the United States and article I, section 20 of the North Carolina Constitution protect private citizens against unreasonable searches and seizures." *Johnson*, ¶ 16. The Supreme Court of the United States has recognized that "the State's intrusion into a particular area, whether in an automobile or elsewhere, cannot result in a Fourth Amendment violation unless the area is one in which there is a constitutionally protected reasonable expectation of privacy." *New York v. Class*, 475 U.S. 106, 112, 89 L. Ed. 2d 81, 89 (1986) (citation and internal quotation marks omitted). In North Carolina,

a license plate must be affixed to the exterior of a car and be "plainly readable from a distance of 100 feet during daylight." N.C. Gen. Stat. § 20-63(c)–(d) (2021). "[I]t is unreasonable to have an expectation of privacy in an object required by law to be located in a place ordinarily in plain view from the exterior of the automobile." *Class*, 475 U.S. at 114, 89 L. Ed. 2d at 90. And "[t]he exterior of a car, of course, is thrust into the public eye, and thus to examine it does not constitute a 'search.' " *Id.*

¶ 15        Pursuant to *Class*, it is evident that a license plate check is not a "search" under the Fourth Amendment. Although the State recognizes that our appellate courts have not explicitly ruled on whether a license plate check constitutes a search, the State notes that previous opinions of this Court have hinted at this conclusion. *See State v. Murray*, 192 N.C. App. 684, 688–89, 666 S.E.2d 205, 208–09 (2008) (analyzing the constitutionality of a traffic stop, notwithstanding the fact that the law enforcement officer had already conducted a "check of the license plate" of the defendant's vehicle prior to the stop); *cf. State v. White*, 82 N.C. App. 358, 362, 346 S.E.2d 243, 246 (1986) (concluding that a law enforcement officer's investigation of a driver's license number marked on stereo equipment in plain view through window of a car was not "sufficiently intrusive as to amount to a constitutionally impermissible search of [the] defendant's automobile"), *cert. denied*, 323 N.C. 179, 373 S.E.2d 124 (1988). Our conclusion is in line with these precedents.

¶ 16        Further, our conclusion is consistent with the analysis of the federal appellate

courts that have ruled on this issue. *See, e.g.*, *United States v. Diaz-Castaneda*, 494 F.3d 1146, 1152 (9th Cir.) ("[W]hen police officers see a license plate in plain view, and then use that plate to access additional non-private information about the car and its owner, they do not conduct a Fourth Amendment search."), *cert. denied*, 552 U.S. 1031, 169 L. Ed. 2d 410 (2007); *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 529 (5th Cir.) ("A motorist has no privacy interest in her license plate number. Like the area outside the curtilage of a dwelling, a car's license plate number is constantly open to the plain view of passersby." (citations omitted)), *reh'g denied*, No. 98-20027, 1999 U.S. App. LEXIS 26265 (5th Cir. 1999). Accordingly, the investigation of the Cadillac's license plate was not a Fourth Amendment search requiring *any* degree of suspicion. To the extent that the trial court implicitly concluded that Defendant had a reasonable expectation of privacy in the Cadillac's license plate number sufficient to implicate his Fourth Amendment rights, this was in error.

¶ 17        This leaves for resolution the issue of whether Officer Bixby had reasonable suspicion to stop the Cadillac based on the investigation of its license plate. "Law enforcement officers may initiate a traffic stop if the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Johnson*, ¶ 16 (citation and internal quotation marks omitted). In this case, the officers learned from their license plate checks that Defendant's "driver's license status was medically canceled[.]"

¶ 18        "A law enforcement officer may stop a motorist when the officer has probable

cause to believe that the motorist has committed a readily observed traffic infraction." *State v. Parker*, 183 N.C. App. 1, 7, 644 S.E.2d 235, 240–41 (2007) (internal quotation marks omitted). Therefore, a law enforcement officer with either probable cause or reasonable suspicion[2] to believe that the driver of a vehicle is driving with a medically canceled license may conduct a lawful traffic stop of that vehicle without running afoul of the Fourth Amendment.

¶ 19        The officer here had sufficient information to believe that Defendant had, at the very least, "committed a readily observed traffic infraction"—if not a misdemeanor, as discussed below—and lawfully conducted a traffic stop of Defendant's vehicle. *Id.* Thus, the trial court erred by concluding otherwise.

### 2. *Probable Cause to Arrest Defendant*

¶ 20        We next address whether Officer Bixby had probable cause to arrest Defendant, and therefore, to search him incident to that arrest. While "[i]t is a well-established principle that an officer may make a warrantless arrest for a misdemeanor committed in his or her presence[,]" *State v. Brooks*, 337 N.C. 132, 145, 446 S.E.2d 579, 588 (1994); N.C. Gen. Stat. § 15A-401(b)(1), a law enforcement officer has "no authority to arrest [an individual] for the commission of an infraction[,]" *State*

---

[2] "Reasonable suspicion . . . requires less than probable cause and considerably less than preponderance of the evidence." *Johnson*, ¶ 16 (citation and internal quotation marks omitted).

*v. Braxton*, 90 N.C. App. 204, 208, 368 S.E.2d 56, 59 (1988). Accordingly, this issue turns on whether Defendant's alleged act of driving with a medically canceled license was a misdemeanor, or as Defendant argues and the trial court concluded, an infraction. We conclude that the offense of driving with a medically canceled license is a misdemeanor, justifying the warrantless arrest and search incident to the arrest.

¶ 21    Defendant claims that the official notice of his license's medical cancellation provides "in plain language the punishment for noncompliance shall be deemed the equivalent of operating a motor vehicle without any driver's license." However, the four identical notices that DMV sent to Defendant during the period between 28 July 2018 and 1 February 2019 include no such pronouncements.

¶ 22    The notices cite N.C. Gen. Stat. §§ 20-9(g)(2) and 20-29.1 for the statutory authority to cancel Defendant's license. Section 20-9(g) describes the DMV's authority to issue restricted or unrestricted licenses, and subsection (g)(2) provides, in pertinent part, that the DMV "may request a signed certificate from a health care provider duly licensed to practice medicine in the United States that the applicant or licensee has submitted to a physical examination by the health care provider." N.C. Gen. Stat. § 20-9(g)(2). Section 20-29.1 describes the Commissioner of Motor Vehicles' authority to require a driver to submit to a reexamination upon "good and sufficient cause to believe that a licensed operator is incompetent or otherwise not qualified to be licensed[.]" *Id.* § 20-29.1. In appropriate circumstances, the Commissioner "may

suspend or revoke the license of such person or permit him to retain such license, or may issue a license subject to restrictions or upon failure of such reexamination may cancel the license of such person until he passes a reexamination." *Id.* Notably, this section also provides that "[r]efusal or neglect of the licensee to submit to such reexamination *shall be grounds for the cancellation of the license of the person failing to be reexamined*, and the license so canceled shall remain canceled until such person satisfactorily complies with the reexamination requirements of the Commissioner." *Id.* (emphasis added).

¶ 23      Section 20-29.1 further describes the Commissioner's discretionary authority to issue restricted or limited driver's licenses, and adds:

> Such a limitation or restriction shall be noted on the face of the license, and it shall be unlawful for the holder of such limited or restricted license to operate any motor vehicle or class of motor vehicle not specified by such restricted or limited license, and *the operation by such licensee of motor vehicles not specified by such license shall be deemed the equivalent of operating a motor vehicle without any driver's license.*

*Id.* (emphasis added).

¶ 24      Defendant argues that § 20-29.1 "is clear and unambiguous. It clearly states that an infraction shall be deemed the equivalent of operating a motor vehicle without any driver's license." We find no such clear statement in the plain text of § 20-29.1. Section 20-29.1 describes the various circumstances under which a driver's license

may be suspended, revoked, restricted, or canceled pursuant to the Commissioner of Motor Vehicles' authority to require a driver to submit to medical examination, and it more specifically provides that a *restricted* licensee's operation of a motor vehicle not specified by the license "shall be deemed the equivalent of operating a motor vehicle without any driver's license." *Id.* But this neither applies to a medically canceled license nor does it provide that the offense is an infraction.

¶ 25      First, we address the nature of a medically canceled license. Section 20-15(a) describes the DMV's authority to cancel a license and provides, in pertinent part, that the DMV "shall have authority to cancel any driver's license upon determining" that "[t]he licensee has failed to submit the certificate required under" N.C. Gen. Stat. § 20-9(g). *Id.* § 20-15(a)(5). Section 20-4.01(2) defines "canceled" for purposes of Chapter 20: "As applied to drivers' licenses and permits, a declaration that a license or permit which was issued through error or fraud, *or to which* [*N.C. Gen. Stat. §*] *20-15(a) applies, is void and terminated.*" *Id.* § 20-4.01(2) (emphasis added). Reading these provisions together, we conclude that a driver's license that is medically canceled pursuant to § 20-29.1 for failure to submit a required medical certificate pursuant to § 20-9(g), thus subjecting the license to cancellation pursuant to § 20-15(a)(5), is "void and terminated" pursuant to § 20-4.01(2).

¶ 26      One argument advanced by the State is that the offense of driving with a medically canceled license is the functional equivalent of the misdemeanor offense of

driving while license revoked, *see id.* § 20-28(a), because Chapter 20 treats the terms "revocation" and "suspension" synonymously and defines them both as the "[t]ermination of a licensee's . . . privilege to drive . . . for a period of time stated in an order of revocation or suspension[,]" *id.* § 20-4.01(36). However, the record does not contain such an order of revocation or suspension for the period in which Defendant's license was medically canceled. We therefore disagree with the State that the offense of driving with a medically canceled license is necessarily akin to the offense of driving while license revoked. Rather, we agree with another of the State's arguments: because a medically canceled license is "void and terminated" under § 20-4.01(2), the offense of driving with a medically canceled license is comparable to the offense of driving without a license.

Yet we do not accept Defendant's blanket assertion that "a person operating a motor vehicle without a license is responsible for an infraction." Section 20-35(a) states generally that "[e]xcept as otherwise provided in subsection (a1) or (a2) of this section, a violation of this Article is a Class 2 misdemeanor unless a statute in the Article sets a different punishment for the violation." *Id.* § 20-35(a).

Subsections (a1) and (a2) enumerate six exceptions to the general Class 2 misdemeanor classification:

> (a1) The following offenses are Class 3 misdemeanors:
>> (1) Failure to obtain a license before driving a motor

vehicle, in violation of [N.C. Gen. Stat. §] 20-7(a).

(2) Failure to comply with license restrictions, in violation of [N.C. Gen. Stat. §] 20-7(e).

(3) Permitting a motor vehicle owned by the person to be operated by an unlicensed person, in violation of [N.C. Gen. Stat. §] 20-34.

(a2) A person who does any of the following is responsible for an infraction:

(1) Fails to carry a valid license while driving a motor vehicle, in violation of [N.C. Gen. Stat. §] 20-7(a).

(2) Operates a motor vehicle with an expired license, in violation of [N.C. Gen. Stat. §] 20-7(f).

(3) Fails to notify the Division of an address change for a drivers license within 60 days after the change occurs, in violation of [N.C. Gen. Stat. §] 20-7.1.

*Id.* § 20-35(a1)–(a2).

¶ 29    Defendant specifically cites § 20-35(a2)(3) (failure to report address change) to support his assertion that driving with a medically canceled license is an infraction, but we fail to see how that provision supports his claim. Instead, the provision that most plausibly supports Defendant's argument is subsection (a2)(1) (failure to carry a valid license while driving).

¶ 30    However, the State argues that § 20-35(a2)(1) "applies only when a driver has a valid license in the first instance but fails to abide by the requirement set forth in [N.C. Gen. Stat.] § 20-7(a) that he or she 'must carry the license while driving the

vehicle.'" Further, the State notes that "[t]he offense of no operator's license encompasses a range of potential punishments" and is classified as a misdemeanor unless the conduct specifically falls within one of the enumerated exceptions to § 20-35(a2), or another statute provides otherwise. For example, each of the Class 3 misdemeanors listed in § 20-35(a1) could also be described as driving without a license. *See* N.C. Gen. Stat. § 20-35(a1). We thus reject the sweeping assertion that the offense of driving with a medically canceled license is necessarily an infraction, absent a showing of specific facts placing the offense within one of the enumerated exceptions to § 20-35(a2), which are not present in the case at bar. We conclude that the offense that Defendant was alleged to have committed does not fall within the enumerated exceptions of § 20-35(a1)–(a2) or another statute, and thus is a Class 2 misdemeanor. *Id.* § 20-35(a).

¶ 31        In that the offense that Defendant allegedly committed was a misdemeanor, the trial court erred by concluding that "[t]he medical cancellation on [Defendant's] license was not an arrestable offense[.]" "[A]n officer may make a warrantless arrest for a misdemeanor committed in his or her presence[,]" *Brooks*, 337 N.C. at 145, 446 S.E.2d at 588, and "[a]n officer may conduct a warrantless search incident to a lawful arrest[,]" *State v. Robinson*, 221 N.C. App. 266, 276, 727 S.E.2d 712, 719 (citation omitted), *appeal withdrawn*, 366 N.C. 247, 731 S.E.2d 161 (2012). The law enforcement officers had probable cause to arrest Defendant and to search Defendant

incident to his arrest. Accordingly, the officers lawfully seized the evidence discovered during the search of Defendant incident to his arrest.

### III.    Conclusion

For the foregoing reasons, the trial court's order granting Defendant's motion to suppress is reversed, and the matter is remanded to the trial court for further proceedings.

REVERSED AND REMANDED.

Chief Judge STROUD and Judge MURPHY concur.